UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DOMINIQUE DARNELL ROBINSON,

Plaintiff,

v. Case No. 24-cv-1280-bhl

TAMMI BRANDT et al.,

Defendants.

---

## DECISION AND ORDER

---

Plaintiff Dominique Darnell Robinson, who is incarcerated at the Jackson Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on claims that Defendant Nurses Tammi Brandt, Leah Donovan, Brittany Stroika, and Dana Griffin[1] violated his constitutional rights while he was incarcerated at the Milwaukee County Jail. On April 30, 2026, Defendants filed a motion for summary judgment. For the reasons explained below, the Court will grant the motion and dismiss this case.

## BACKGROUND

In 2006, Robinson was convicted and given a lengthy prison sentence to be followed by a period of extended supervision. According to Department of Correction records, of which the Court may take judicial notice, he was released on extended supervision on October 18, 2022. On October 1, 2023, he was admitted to the Milwaukee Secure Detention Facility on a hold and released less than a week later. Three days after being released, on October 8, 2023, Robinson was booked into the Milwaukee County Jail on new charges as well as for violating the terms of his supervised release. *See Robinson v. Carrington*, No. 24-cv-0798-bhl, Dkt. No. 76 at ¶2 (E.D. Wis. May 14, 2026), of which the Court takes judicial notice. At that time, the Defendant Nurses worked at the jail.

---

[1] Throughout their summary judgment materials, the parties refer to the Nurses Tammi, Leah, and Brittany by their first names. To avoid confusion, the Court will do likewise.

On November 13, 2023, Robinson fainted in his cell. The medical records state that Robinson reported he had passed out because he had not eaten all day. Robinson clarifies that he also complained of feeling light-headed and having chest pains. According to Robinson, he woke up to nurses shining lights in his face and asking him to respond to verbal cues. Nurse Tammi immediately assessed Robinson and because Robinson was disoriented and unable to walk, he was taken by wheelchair to the health services unit. There, Nurse Tammi investigated the origin of Robinson's fainting, educated him on the importance of staying hydrated and eating, and advised him to notify medical staff if his symptoms worsened or changed. Robinson asserts that, despite knowing he had hit his head, she did not perform a concussion assessment.[2] Nurse Tammi prescribed 1000mg of acetaminophen for 14 days and ice packs and gave Robinson a Boost nutritional shake. Dkt. No. 66, 94 at ¶¶15-18; Dkt. No. 109 at ¶¶3-11.

Two days later, on November 15, 2023, Robinson submitted two health services requests in which he stated that he had suffered a "severe head injury" and that the Tylenol and ice packs were not helping. Robinson requested a CT scan or MRI. Robinson was seen the next day by a non-defendant provider, at which time Robinson reported that his pain was 10/10 and he was having severe headaches, sensitivity to light, and pain in his neck and lower back. The provider assessed Robinson's symptoms, continued the Tylenol prescription, and ordered neurological checks for three days. The provider noted that there was no indication that Robinson had suffered a head injury as his physical and neurological examinations were normal. Accordingly, the provider concluded there was no medical need for a CT scan or MRI. Finally, the provider referred Robinson for x-rays of his spine. The results were returned a few days later and were normal apart from age-related degeneration. Dkt. No. 66, 94 at ¶¶19-29.

On November 27, 2023, Robinson submitted a health services request renewing his demand for a CT scan. Staff responded that a CT scan was not medically necessary. About a week later, on December 4, 2023, Robinson was evaluated by Nurse Leah who performed a physical and neurological examination. Nurse Leah explained to Robinson that she agreed with the other providers that there was no medical necessity for a CT scan or MRI. According to Robinson, Nurse Leah also informed him that he was suffering from "post-concussion syndrome" and that it was too late for imaging because his brain was already in the healing stages. Nurse

[2] Throughout his response materials, Robinson refers to "concussion assessments" and "concussion protocol" without providing evidence from a qualified medical source explaining what those terms mean.

Leah prescribed Naproxen and scheduled him for a follow-up appointment in two to three weeks. She also stated that he should be referred to ophthalmology if his blurry vision persisted. Finally, she ordered that Robinson should consult with the on-site physical therapist. Dkt. No. 66, 94 at ¶¶30-34.

On December 12, 2023, Robinson was seen by Nurse Tammi for a follow-up appointment. She performed physical and neurological examinations and concluded that there was no clinical need for a CT scan or MRI. Nevertheless, in response to Robinson's complaints of pain and insistence that he receive diagnostic testing, she ordered a CT scan, which Robinson received on January 10, 2024. The results were negative for any intracranial abnormality. Robinson asserts that he "knew something was not right with his brain," so he continued to request an MRI. Staff repeatedly informed him that the results of the physical and neurological examinations did not suggest that an MRI was necessary. Robinson persisted, so on March 14, 2024, a non-Defendant provider ordered an MRI. The results were negative for anything other than degenerative changes. Dkt. No. 66, 94 at ¶¶35-45.

On January 29, 2024, Nurse Leah had a follow-up appointment with Robinson. The medical records note that Robinson continued to complain of significant back and neck pain that at times radiated from his neck to mid-back. She also reviewed the notes from the physical therapist, who had recommended neck and mid-back stretching. She diagnosed a back and neck strain and continued his prescription for meloxicam and duloxetine. She also ordered hot packs in response to Robinson's request and recommended that he continue with physical therapy and the stretching exercises. Dkt. No. 67-2 at 298; Dkt. Nos. 66, 94 at ¶¶50-51.

A few months later, in May 2024, Nurse Leah instructed Robinson to complete a "spine conditioning program" on his own because, due to staffing issues, physical therapy was not being offered at the jail. According to Robinson, these exercises further injured him and caused more pain. Robinson submitted a health services request stating that he had tried the exercises, but his back and neck now hurt worse than before. Nurse Brittany received the request and after reviewing Robinson's chart instructed Robinson to stop doing the exercises if they were causing him pain. She also informed him that he had an appointment with physical therapy scheduled later that month. Dkt. Nos. 66, 94 at ¶¶70-75; Dkt. No. 109 at ¶¶18-25.

Finally, Robinson asserts that on June 6, 2024, Nurse Tammi discontinued his prescription for duloxetine after she was informed that Robinson had diverted his medication by "cheeking" it,

*i.e.*, attempting to hide it in his cheek instead of swallowing it, and that the medication had been found in his cell during a shakedown. About a week later, on June 13, 2024, Robinson asserts that he experienced severe pain in the middle of the night. He pressed his medical call button four times but was told by the officer that he did not have a medical emergency and that he should submit a health services request the next day. Robinson asserts that he later learned that Nurse Griffin was the one who informed the officer that Robinson did not require emergency treatment. Robinson waited two days, until June 15, 2024, to file a health services request. He was later examined by a non-Defendant provider who observed that Robinson had a steady gait, was well developed and well nourished and was not in acute distress. Dkt. Nos. 66, 94 at ¶58, 76-87; Dkt. No. 109 at ¶¶31-38.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Robinson asserts that the Defendants' responses to his complaints of pain following a fainting incident violated his constitutional rights. At the relevant time, Robinson was at the jail on a Division of Community Corrections hold—he had been convicted of a crime and had served a prison sentence, after which he was released on extended supervision to serve the remainder of his sentence in the community. Robinson was subsequently reincarcerated both because he did

not comply with the terms of his extended supervision *and* because he faced new criminal charges. Robinson was therefore both a convicted prisoner and a pretrial detainee.

Claims by convicted prisoners are governed by the Eighth Amendment, whereas claims by pretrial detainees are governed by the Fourteenth Amendment. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015). The standards under these Amendments differ, and although the Seventh Circuit has acknowledged district courts' uncertainty regarding which Amendment applies when a plaintiff is both a prisoner and pretrial detainee, the appellate court has not definitively addressed the issue. *See Estate of Clark v. Walker*, 865 F.3d 544, 546 n.1 (7th Cir. 2017). Pretrial detainees are entitled to a broader standard because they have not yet been convicted of a crime and therefore cannot be punished. This is not true of Robinson—he had been convicted of a crime for which he was still serving a sentence. The most that can be said of Robinson is that he had not yet been convicted of *additional* crimes, but that circumstance should not entitle him to the broader protections of the Fourteenth Amendment. Accordingly, the Court concludes that Robinson's claims arise under the Eighth Amendment. *See Watkins v. Wheeler*, No. 24-CV-884, 2026 WL 36065, at *3 (E.D. Wis. Jan. 6, 2026) ("even though plaintiff faced pending charges, the fact is that [on the day of the incident], he was a convicted prisoner").

"[T]he Eighth Amendment, as the Supreme Court has interpreted it, protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." *Gabb v. Wexford Health Sources, Inc*., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). The Court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment; it asks: 1) "whether a plaintiff suffered from an objectively serious medical condition" and 2) "whether the individual defendant was deliberately indifferent to that condition." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc)). The parties do not dispute that Robinson suffered from an objectively serious medical condition. As such, the only issue before the Court is whether Robinson has presented evidence from which a jury could reasonably conclude that the Defendants were deliberately indifferent to his complaints of pain. He has not. Accordingly, for the reasons explained below, the Defendants are entitled to summary judgment.

As to Nurses Tammi and Leah, the medical records show that Robinson's condition was assessed in his cell, and he was observed to be alert and oriented and with pupils that were equal

and reactive. After determining Robinson could be safely moved, he was transported to the health services clinic where he was further assessed and treated by Nurse Tammi, who prescribed Tylenol and ice packs and gave him a Boost nutritional shake. She also advised him on the importance of eating and staying hydrated and instructed him to submit a health services slip if his symptoms got worse.

In the months after he fainted, Robinson was evaluated by multiple providers, including Nurses Tammi and Leah. All assessments were unremarkable. Nurse Leah nevertheless took Robinson's complaints seriously and performed physical and neurological examinations. Despite normal results, she acknowledged Robinson's complaints and prescribed Naproxen for his pain. She also ordered follow-up appointments, a referral to ophthalmology in the event his blurry vision continued, a consult with the onsite physical therapist, and provided a stretching plan that Robinson could perform on his own when physical therapy became unavailable due to staffing issues. Robinson asserts that he was never referred to ophthalmology, but he also presents no evidence that he continued to complain of blurry vision, meaning that a referral was not medically indicated. He also complains that the stretching program caused him more pain, but nothing in the record suggests that Nurse Leah knew the stretching exercises she recommended would harm him. Put plainly, Nurse Leah is entitled to summary judgment because no jury could reasonably conclude based on the extensive and responsive treatment she provided to Robinson that she was deliberately indifferent to his complaints of pain.

Nurse Tammi is entitled to summary judgment for the same reason. After evaluating Robinson, she too concluded there was no clinical need for diagnostic testing. Nevertheless, she responded to Robinson's persistent concerns by ordering a CT scan. As noted, the results were normal so Robinson was not harmed simply because he did not receive a CT scan when he demanded it. Robinson speculates that an earlier CT scan may have shown abnormalities, but even assuming that possibility, he offers no evidence suggesting that the prescribed treatment, *i.e.*, rest and pain medication, would have differed. Nurse Tammi also explains that she discontinued one of Robinson's pain medications after receiving reports that he had been caught "cheeking" the medication and that it was found in his cell. Robinson asserts that he never diverted his medication, but he provides no evidence that Nurse Tammi knew that the reports of Robinson's misconduct were false. *See Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014) (holding that prison staff are not required to believe everything inmates say). Medication diversion is a significant issue in the

jail, and Nurse Tammi's decision to rely on the reports she received from corrections staff do not demonstrate she was deliberately indifferent to Robinson's condition, especially considering the totality of the care that Robinson received, which included other pain medications. Robinson may have disagreed with the decisions regarding his care, but a disagreement between a prisoner and medical staff about proper treatment is not enough to constitute deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Finally, no jury could reasonably conclude that Nurse Brittany was deliberately indifferent to Robinson's condition when she instructed him to stop doing the stretching program if it was making his pain worse. This commonsense advice was followed up with confirmation that Robinson had an appointment with physical therapy in the coming weeks. At this point, Robinson had been prescribed numerous pain medications and was under the near-constant care of various providers. Nothing in Robinson's health services request indicated he needed emergency treatment, and the fact that Nurse Brittany informed him of his upcoming appointments does not suggest that she was deliberately indifferent to his condition. Similarly, Nurse Griffin's instruction to Robinson to submit a health services request in the morning in response to his middle-of-the-night complaints of pain does not indicate deliberate indifference. Again, Robinson consistently complained of pain, and nothing suggested that he required emergency treatment in the middle of the night. Indeed, Robinson did not seek additional treatment until two days later, confirming that he was not harmed by Nurse Griffin's refusal to drop everything and examine him when he demanded. Without evidence that she knew that a short delay in delivering treatment would needlessly and substantially prolong a dangerous medical condition, the delay itself did not violate the Eighth Amendment. *See Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (holding that a two-day delay in delivering pain medication did not, by itself, show "a culpable mental state"). Nurse Brittany and Nurse Griffin are therefore also entitled to summary judgment.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' summary judgment motion (Dkt. No. 64) is **GRANTED** and this case is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

**IT IS FURTHER ORDERED** that Robinson's motion to file a sur-reply (Dkt. No. 121) is **GRANTED**.

Dated at Milwaukee, Wisconsin on November 24, 2026.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
Chief United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.